UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| In RE: LISA RENEE CALLICOTT, | ) | |
|---|---|---|
| Debtor, | ) | |
| NUVELL CREDIT COMPANY, | ) | |
| Appellant, | ) | |
| vs. | ) | Case No. 4:08CV692 CDP |
| LISA RENEE CALLICOTT, | ) | |
| Appellee. | ) | |

## MEMORANDUM AND ORDER

This bankruptcy appeal presents an issue that has been dubbed the "Rorschach Inkblot Test of the bankruptcy bench and bar."[1] When debtor Lisa Renee Callicott purchased her new Chevrolet, she traded in a Chrysler on which she still owed money. Callicott refinanced the "negative equity" in her old car when she obtained the financing for the new car. Nuvell Credit Company contends that the entire debt must be considered a secured debt, under the hanging paragraph added to the bankruptcy law in 2005, 11 U.S.C. § 1325(a)(*).[2] To

---

[1] *In re Busby*, 393 B.R. 443, 448 (S. D. Miss. 2008).

[2] The section in question is commonly referred to as the "hanging paragraph" or section 1325(a)(*) because it comes after section 1325(a)(9) and is separate from that paragraph, but it is not separately designated or numbered.

decide this question, I must determine whether Missouri law grants the creditor a purchase money security interest in the trade-in's negative equity. I conclude that it does not, and so I will affirm the decision of the bankruptcy court.

## Jurisdiction and Standard of Review

This Court has jurisdiction over this matter under 28 U.S.C. § 158(a)(1), which provides for appellate review of final judgments, orders, and decrees of the bankruptcy court. The order sustaining Callicott's objection to Nuvell's proof of claim is final because it resolves a discrete dispute within the bankruptcy case. *See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 657 (2006); *In re M&S Grading, Inc.*, 526 F.3d 363, 368 (8th Cir. 2008). In a bankruptcy appeal findings of fact are reviewed for clear error, but questions of law are subject to *de novo* review. *In re Vote*, 276 F.3d 1024, 1026 (8th Cir. 2002). This case presents a purely legal issue.

## Factual Background

On January 20, 2006, Callicott obtained financing to purchase a 2005 Chevrolet Impala. She traded in a 1999 Chrysler 300M, on which she still owed $7,149.65. Callicott was given a trade-in allowance of $3,000. Nuvell included the balance of $4,149.65 (representing Callicott's "negative equity" in the Chrysler trade-in) in the amount it loaned Callicott when she bought the

Chevrolet.

On July 26, 2007, Callicott filed a voluntary bankruptcy petition under Chapter 13. Nuvell filed a proof of claim in the amount of $26,709.14. This amount included the loan for the negative equity from the Chrysler as well as the loan for the purchase price for the new Chevrolet.[3] Callicott objected to inclusion of the trade-in's negative equity as part of the secured debt. The issue before the bankruptcy judge was whether the negative equity from the Chrysler was protected from cram down as a purchase money security interest. The bankruptcy judge found that it was not, and ordered that Nuvell had a secured claim of $20,164.49 and an unsecured claim in the amount of $4,149.65, the amount of the trade-in's negative equity.

Discussion

Before the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, creditors with security interests in vehicles were deemed to hold a secured claim only to the extent of the value of the vehicle, and any amount beyond the value of the vehicle was treated as a separate, unsecured claim. *See* 11 U.S.C. § 506(a)(1). The hanging paragraph of § 1325(a)(9), however, was

---

[3]The claim also included amounts lent for Callicot's purchase of Careguard in the amount of $1,795.00 and GAP protection in the amount of $600.00, but the parties have resolved any dispute regarding these amounts.

added to prevent a debtor from doing this for certain vehicles:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a)(*). This is the provision at issue in the case, and although the provision has spawned a great deal of debate, several things are not debated. First, the hanging paragraph recognizes the economic fiction that some debts can be considered "secured" even though the amount of the debt exceeds the value of the collateral. Second, there is no doubt that any negative equity Callicott had in her *new car* – the Chevrolet – at the time of her bankruptcy is secured debt and cannot be stripped off and crammed down. Third, Congress intended exactly that result, as it believed the cram down provisions of § 506 had been abused when it came to vehicles.[4]

Whether the provision relates to negative equity in the *trade-in*, however, is not at all clear, and courts are divided. Part of the problem is that the Bankruptcy

---

[4]"Although the hanging paragraph has caused significant confusion and incoherence in the law and has been rightly criticized for its poor drafting, its legislative history leaves little doubt that its architects intended only good things for car lenders and other lienholders." *Graupner v. Nuvell Credit Corp.*, 537 F.3d 1295, 1297 (11th Cir. 2008).

Code does not define the key term of the hanging paragraph – purchase-money security interest – so courts must look to the law of the state where the security interest was created. Most state laws, however, do not contemplate the creation of security interests in assets that are no longer available for collection of a debt, such as the traded-in Chrysler here. It is not surprising that bankruptcy courts have reached such varying results when trying to resolve whether a creditor has a purchase money security interest in the negative equity of a vehicle that was traded in and sold long before the bankruptcy.

Missouri has adopted the standard U.C.C. language regarding purchase money security interests. *Compare* Mo. Rev. Stat. 400.9-103 *with* U.C.C. § 9-103. The U.C.C. does not explicitly define a PMSI, but rather, states:

> (b) A security interest in goods is a purchase-money security interest:
>
> (1) to the extent that the goods are *purchase money collateral* with respect to the security interest; . . .

Mo. Rev. Stat. § 400.9-103 (b)(1) (emphasis added).

"Purchase-money collateral," in turn, means "goods or software that secures a *purchase money obligation* incurred with respect to that collateral." § 400.9-103(a)(1).

And "Purchase-money obligation" is "an obligation of an obligor incurred

as all or part of the *price of the collateral* or for *value given to enable the debtor to acquire rights* in or the use of the collateral if the value is in fact so used." § 400.9-103(a)(2) (emphasis added).

Comment 3 to the UCC and the Missouri statute makes clear that many expenses related to the acquisition of the collateral can be included:

> As used in subsection (a)(2), the definition of "purchase-money obligation," the "'price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.
>
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of the collateral and the secured obligation.

Mo. Rev. Stat. § 400.9-103 cmt. 3.

Nuvell arges that because Callicott traded in the Chrysler when she bought the Chevrolet, the money she was lent to pay off the debt she still owed on the Chrysler was "value given to enable" her to purchase the Chevrolet, and so, in essence, became part of the "price" of the Chevrolet, just like taxes or finance charges would become part of the "price" of the collateral. Callicott argues, on the other hand, that the value of the trade-in's negative equity is not covered by a PMSI because she did not borrow that money to buy the new car, but instead

borrowed it to pay off an antecedent debt. I agree with Callicott and the bankruptcy judge that this was a loan to pay off an antecedent debt, and that there is no PMSI in the trade-in's negative equity.

As discussed above, the U.C.C. Comment requires a "close nexus" between the acquisition of collateral and the secured obligation. The things listed in the Comment as examples of "expenses incurred in connection with acquiring" rights in the collateral are not similar to what happened here. Finance charges, sales taxes, and expenses of collection are all rightfully included in the PMSI because they are things that necessarily accompany the purchase of a new car, and so it makes some sense to say they become part of the purchase money collateral. Paying off the debt on an old car is different, as a buyer might or might not choose to handle it as Callicott did here. The money advanced to Callicott to pay off the debt on her old Chrysler was not part of the price of the new Chevrolet, and the close nexus required is missing. Although Nuvell argues that its extension of credit for Callicott to pay off the loan on the trade-in was required for her to purchase the new car, it is just as likely that this was simply a matter of convenience.

Callicott's argument has been adopted by many courts, yet many others have accepted Nuvell's arguments. *See Graupner v. Nuvell Credit Corporation*,

537 F.3d 1295, 1300 (11th Cir. 2008) (collecting cases in both camps); *see also In re Mierkowski*, 2008 WL 4449471 (Bankr. E. D. Mo. Sept. 29, 2008)(no PMSI); *In re Busby*, 393 B.R. 443 (Bankr. S. D. Miss. 2008)(same); *In re Muldrew*, 2008 WL 4458798 (Bankr. E. D. Mich. Oct. 3, 2008) (PMSI); *In re Dale*, 2008 WL 4287058 (S. D. Tex. Aug. 14, 2008) (same).

The only Circuit Court of Appeals to decide the question – the Eleventh – considered Georgia law and ruled in favor of the creditor. *Graupner v. Nuvell Credit Corporation*, 537 F.3d 1295 (11th Cir. 2008). The Second Circuit recently refused to decide the issue now, and instead certified the state-law question of whether negative equity in a trade-in is part of a purchase-money obligation to the New York Court of Appeals. *Peaslee v. GMAC, LLC*, 2008 WL 4614524 (2nd Cir. Oct. 20, 2008). Each of those courts looked to the state's motor vehicle financing law as well as to the U.C.C.

In *Graupner*, the Eleventh Circuit discussed the competing decisions from around the country and stated that the question was "a close call." 537 F.3d at 1301. It approved the bankruptcy court's reading the Georgia's Motor Vehicle Sales Finance Act *in pari materia* with Georgia's version of the U.C.C. The bankruptcy court there had pointed out that the MVSFA specifically defined "cash sale price" to include amounts used to pay off negative equity in a trade-in

vehicle. 537 F.3d at 1299. The Eleventh Circuit concluded that Congress had intended this result, relying in part on information about changing industry practices and estimates that "negative equity trade-in transactions occurred in from 29 to 38 percent of all new vehicle purchases in past years, and that figure appears only to be on the rise." 537 F.3d at 1303.

The Second Circuit did not find the analysis to be so simple, and so certified the question to state court, because no state court had decided the issue and it was an issue "guaranteed to recur." *Peaslee*, 2008 WL 4614524 at * 6. Like *Graupner*, the *Peaslee* court looked to the state's version of the Motor Vehicle Retail Installment Sales Act, but unlike *Graupner*, the Second Circuit did not find that law to provide clear answers. *Peaslee*, at * 7. I do not believe either Circuit decision provides a clear answer that I should follow. In particular, I am concerned that *Graupner's* interpretation of Congressional intent went too far. While the language makes clear that Congress intended to favor creditors and stop cram downs for new motor-vehicle purchases – whatever negative equity Callicott undoubtedly had in her new Chevrolet by the time of her bankruptcy – nothing in the language or legislative history shows that Congress was focusing on the one-step-removed problem here – Callicott's negative equity in her old car, the Chrysler that she traded in.

Both *Graupner* and *Peaslee* looked to the state motor vehicle finance laws as well as to the U.C.C., and Nuvell argues here that I should do so as well. Missouri's Motor Vehicle Time Sales Act, Mo. Rev. Stat. § 365.020, is Missouri's equivalent to the Georgia and New York Motor Vehicle Retail Instalment Sales Acts, and, like those acts and the federal Truth in Lending Act, provides certain consumer protection by specifying the types of charges and disclosures necessary for auto financing. The Georgia and New York laws include trade-in negative equity in the "cash sale price" of a new vehicle, but Missouri does not. *Compare* N.Y. Pers. Prop. Law § 301(6) *and* Ga. Code Ann § 10-1-31(a)(1) *with* Mo. Rev. Stat. § 365.020(1). Missouri does include the amounts financed for trade-in negative equity in the definition of "Principal balance," § 365.020(8), but that inclusion does not make the existence of a purchase money security interest any more or less likely, and I conclude that the Missouri statute does not provide guidance on the question here.

Instead, I must look, as did the bankruptcy judge, to the U.C.C. and to the hanging paragraph itself. I believe the bankruptcy court here got it right, and that, on the evidence presented here and under Missouri law, there is no purchase-money security interest created in the negative equity of a trade in. The money lent to Callicott to pay off the debt on her old Chrysler was not part of the price of

the new Chevrolet, and the close nexus required is simply missing. Thus, Nuvell's claim for the portion of its debt that was attributable to the negative equity in the trade-in is unsecured, as the bankruptcy court correctly held.[5]

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the bankruptcy court is AFFIRMED in all respects.

**IT IS FURTHER ORDERED** that Nuvell's motion to supplement authority [#12] is granted.

A separate judgment affirming the decision of the bankruptcy court is entered today.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 12th day of November, 2008.

---

[5]Callicott does not argue that the court should apply the "transformational" rule to hold that none of the debt is secured, but even if she did I would agree with the bankruptcy court that the "dual status" rule applies. *See also In re Mierkowski*, 2008 WL 4449471 at *4-5.